*The probate of the paper propounded as the Will of* Mary
Ann Clark.

A will, the due execution of which was proved, was found on the death of the testatrix, in her bureau drawer, with her signature, and the name of the legatee and proponent, partially obliterated; *Held* that the legal presumption was that it had been canceled and revoked by the testatrix; and probate refused.

The contestant of the probate is not held to account for the mutilation under such circumstances.

Review of American cases under statutes similar to that of the State of New York.

    Augustus G. Vanderpoel, *special guardian for Proponent.*
    Richard M. Harrington, *of counsel for Proponent.*
    F. V. S. Oliver, *for next of kin of whole blood.*
    Joseph A. Welsh, *for next of kin of half blood.*

Emma C. Clark presented her petition setting forth the death of the decedent, and that the petitioner was a legatee

named in her last will and testament, and propounded it for probate. Citations to kin were issued. Alfonso Dow, a full brother, and Harriet D. Riker, a full sister, and Francis Dow, John F. Dow and William W. Dow, half brothers, and Hannah W. Fenney, a half sister, of decedent, appeared and contested probate.

It appearing that the petitioner was an infant, the Surrogate appointed a special guardian to represent her on this proceeding.

The following was the paper propounded for probate:

In the name of God: Amen. I, Mary Ann Clark, wife of Charles M. Clark, of the city, county and State of New York, being of sound mind and memory, do make, publish and declare this my last will and testament, in manner following, that is to say: First. I direct my executor, hereinafter nominated and appointed, as soon after my decease as may be practicable, to pay my funeral expenses, also, to pay and discharge all my just debts. Second. I give, devise and bequeath unto my niece, Mary A. Brady, wife of James L. Brady, and my nephew, Francis D. Gilbert, now of London, England, the sum of four thousand dollars, to be divided equally between them, share and share alike, two thousand dollars to each of them. Should either my said niece or nephew die in my lifetime, then, in such case, I give, devise and bequeath the said sum of four thousand dollars to the survivor of them. Third. Should my said niece and nephew both die in my lifetime, then, in such case, I give, devise, and bequeath the said sum of four thousand dollars unto my husband, Charles M. Clark, but should he not survive me, then, in case of the death of my said niece and nephew in my lifetime, I give, devise and bequeath said sum of four thousand dollars unto my sister, Harriet D. Riker, widow of Isaac W. Riker, of the city of New York; and in the case my said niece and nephew, and my said husband and sister should all die in my lifetime, then I give, devise and bequeath

said sum of four thousand dollars unto my brother and sister and half brothers and sisters living at the time of my decease, to be equally divided between them, share and share alike. Fourth. I give, devise and bequeath unto my said sister, Harriet D. Riker, the sum of three hundred dollars; and in case of her death in my lifetime, then I give, devise and bequeath said sum of three hundred dollars to my brother and sisters of whole and half blood, living at the time of my decease, to be equally divided between them, share and share alike. Fifth. I give, devise and bequeath unto my niece, Hattie F. Dow, the sum of two hundred and seventy dollars; and in case of her death in my lifetime, I give, devise and bequeath said sum of two hundred and seventy dollars unto my said brothers and sisters living at the time of my decease, to be equaly divided between them, share and share alike. Sixth. I give, devise and bequeath all the rest, residue and remainder of my estate, both real and personal, of which I shall die seized and possessed, unto my step-

daughter, _(signature)_ daughter of my said husband, Charles M. Clark, to have and to hold the same unto her heirs and assigns forever. Seventh. I do hereby nominate and appoint Sargent V. Bagley, of the city of New York, counselor-at-law, to be the executor of this my last will and testament, hereby giving unto my said executor full power and authority to sell, and by a good and sufficient deed, convey, any and all the real estate of which I may die seized. Lastly, I do hereby revoke all other and former wills by me at any time made. In witness whereof, I have hereunto set my hand and seal, the 25th day of February, one thousand eight hundred and sixty-nine.

_(signature)_ Mary Ann Clark [L. S.]

The foregoing instrument, consisting of two sheets, was, at the date thereof, in our presence and in the presence of each of us, signed, sealed and published by the said Mary Ann Clark, as and for, and by her declared to be, her last will and testament, we, at her request, and in her presence and in the presence of each other, have subscribed our names as witnesses thereto, and set opposite our names our respective places of residence.

W. W. NILES,
    Fordham, Westchester Co., N. Y.

A. LATHEN SMITH,
    No. 405 W. 36th St., N. Y. City.

The signature of the decedent, Mary Ann Clark, to this instrument, had been partially obliterated by two irregular lines drawn horizontally through it, in ink, and apparently by a pen. The name of the legatee and proponent, Emma C. Clark, in the body of the instrument, had been partially obliterated by one horizontal and a number of perpendicular ink lines drawn through it. The paper envelope in which the instrument was, appeared to have been sealed at one time and torn open again.

William W. Niles and Abram Lathen Smith, the subscribing witnesses, proved the due execution of the will and the testamentary capacity of the decedent. There was no question raised as to these facts. The issue was as to the revocation of the will by the decedent.

After the subscribing witnesses had been examined, the Surrogate called the attention of the parties to the following section of the Revised Statutes :

"In all cases, the oath of the person who received the will from the testator, if he can be produced, together with the oath of the person presenting the same for probate, stating the circumstances of the execution, the delivery and the possession thereof, may be required." (3 R. S., 5th ed., p. 150, § 66.)

The proponent thereupon called William W. Niles, who testified as follows:

Q. Do you know who received the paper after the witness had signed it? A. It was handed back to her; she was setting at the desk where she signed it, and the paper was handed to her, but I believe she handed it to Mr. Bagley; I think so from the envelope, which I see is indorsed in his handwriting.

*Cross-examined.*

Q. Did you see Mrs. Clark give this paper to Mr. Bagley after she signed it? A. I do not think I did. I think I left it with her on the table, and went immediately out.

Q. Then you have no knowledge of your own that the paper did not remain in her possession? A. None except what I saw there, if that is knowledge.

Q. You did not see it go out of her possession? A. I stated all I saw to my recollection, which was simply we handed it back to her, and I went about my business.

Q. You said something about some supposition that she gave it to Mr. Bagley; I want to know if she did give it to Mr. Bagley of your own knowledge? A. I do not want to answer anything you do not think proper; but I know nothing except what I see on the envelope containing the paper propounded.

Q. What are the words? A. I have no doubt that the envelope is ours.

Q. What indorsement is there on the envelope? A. "The will of Mrs. Mary A. Clark," in the handwriting of Mr. Bagley; that is all I know about it.

Q. You never have seen this paper in this envelope? A. I saw it here in Court.

Q. Until you saw it here? A. Yes, sir; I saw it before it was brought here, after Mrs. Clark's death.

Q. Not until after her death? A. Not until after her death.

Q. And you have no other material for the supposition

that Mrs. Clark delivered this paper to Mr. Bagley? A. I have other material for the supposition.

Q. Of your own knowledge? A. I have no other personal knowledge.

*Re-direct.*

Q. After the paper had been signed by you, do you recollect what became of it? A. I think it was left with Mr. Bagley.

[Counsel for contestants objects to the answer.]

Q. Do you recollect seeing the paper pass into his hands? A. No, sir; I did not see her hand him the paper at all.

Q. Your last recollection is of seeing the paper in her hands? A. Yes, sir.

Garrett D. Clark, called for proponent, testified:

Q. Where do you reside? A. At 344 West 51st street.

Q. How long have you resided there? A. I think this is the sixth year the first of May.

Q. Did you know Mary Ann Clark during her lifetime? A. Yes, sir.

Q. When did she die? A. I think in the latter part of May.

Q. Cannot you tell the date? A. I do not remember the date.

Q. The latter part of May of what year? A. 1869.

Q. Where did she die? A. She died at my house.

Q. Did you ever see that paper before (the one propounded)? A. I did, sir.

Q. Do you recollect when it was that you first saw it? A. I saw it between her death and her burial.

Q. Where did you first see it? A. I saw it in the third story, rear room, taken out of a bureau drawer, the room occupied by Mrs. Clark.

Q. Had it that envelope upon it at the time? A. Yes, sir.

Q. Was the envelope open, or was it sealed? A. It was broken, the seal had been broken.

Q. Did you take this paper out of the envelope? A. I did, sir.

Q. What was its then condition in comparison with the paper now? A. Just as it is now.

Q. At what time in the day did you find it? A. My impression is that it was late Saturday afternoon.

Q. What did you do with the paper then? A. I put it right into my side coat pocket and kept it there until Sunday.

Q. What did you do with it then? A. On Sunday I called on Mr. Miner, a lawyer that lives in my neighborhood, and showed it to him.

Q. What else? A. I then kept it in my pocket until I left it in the Surrogate's office for probate.

Q. It was in your possession from the time you found it until you delivered it to the Surrogate? A. Yes, sir.

Q. Who was with you when you found it? A. My wife and my niece, the proponent.

Q. Is your wife present in Court? A. Yes, sir.

Q. Is your niece present in Court? A. Yes, sir.

Q. And they were with you when you first discovered it? A. I think my niece discovered it first; we were all looking; we had instructions to look for a will.

Q. Where were you and your wife when she first discovered it? A. All three of us were in that same room.

Q. How far were you from Emma C. Clark when she found it? A. I was probably six or eight feet.

Q. Were you looking at her at the time she found it? A. As she discovered it, I had described the envelope to them, what to look for; as soon as she discovered it she said, "Uncle Gat here it is;" and I went and took it away from her and read it.

Q. She had not time to open and read it? A. She did not open it.

Q. Did she take it out of the envelope? A. I think not; I will not be positive, but my impression is that she did not.

Q. And from that moment of time it never left your possession until you gave it to the Surrogate? A. No, sir.

Q. Is that the same envelope that it was in? A. Yes, sir.

Q. Had it the same indorsement upon it, " The Will of Mrs. Mary A. Clark?" A. Yes, sir.

Q. Was the envelope in the condition it is now? A. There was a little piece of the envelope that hung fast; I see it is now lost entirely; you see there is a little piece torn off near the seal.

The proponents having closed, the contestants thereupon moved that probate be denied, "on the ground that the cancellation and obliteration of the signature of the decedent to the paper propounded, and of the name Emma C. Clark in the body of the paper, by means of several heavy lines in ink being drawn through and across each name, constitute an effectual cancellation, obliteration and destruction of the instrument; and that such injury and destruction, together with the facts that said paper had been in the possession of the testatrix from the moment of its execution, and that it was found in that state, in her custody, after her death, establish a presumptive revocation of the paper propounded as a will."

Argument being had, the Surrogate delivered the following decision:

THE SURROGATE. The facts of this case are, that the paper propounded as a will was executed by the decedent with the legal formalities, that it was found in the drawer of decedent's bureau, by the proponent, a legatee, after the death of decedent, and that, when found, the signature of the decedent was partially obliterated by two or more lines in ink, drawn across it, and the name of the proponent, as legatee, in the body of the will, was also obliterated in like manner. The sole question in the case is, whether the law presumes a revocation to have been

made by the decedent, of the whole will, or any part of the same. We are left in the dark as to when these obliterating lines were made, or by whom, or with what purpose or intent. We have nothing but the facts I have recounted, and the law, applicable to such facts, to guide us to a conclusion.

The Revised Statutes say:

"No will in writing (except in the cases, &c.), nor any part thereof, shall be revoked, or altered, otherwise than by some other will in writing, or some other writing of the testator, declaring such revocation or alteration, and executed with the same formalities with which the will itself was required by law to be executed; or unless such will be burnt, torn, canceled, obliterated or destroyed, with the intent and for the purpose of revoking the same, by the testator himself, or by another person, in his presence, by his direction and consent. And, when so done by another person, the direction and consent of the testator, and the fact of such injury or destruction, shall be proved by at least two witnesses." (3 *R. S.*, *5th ed.*, *p.* 144, § 37.)

In the present case there is no proof that the obliteration was done by any other person than the decedent; and the provision of the statute that the affirmative evidence of at least two persons shall be produced, does not apply. We fall back upon the Common Law of evidence and of presumption. *Williams on Executors*, *vol.* 1, *p.* 85, says: "If a testament was in the custody of the testator, and on his death it is found among his repositories, canceled or defaced, the testator, himself, is presumed to have done the act, and the law presumes that he did it *animo revocandi*. The modern authorities have now settled that the *animus* is to be presumed, till the contrary is proved." [And see note in 2 *Greenleaf on Ev.*, § 681; also 1 *Jarman on Wills*, *p.* 119.]

*Redfield on Wills*, *p.* 307, says: "The rule of evidence in the Ecclesiastical Courts, in regard to presumptive

revocation, from the absence or mutilation of the will, seems to be, that if the will is traced into the testator's possession and custody, and is there found mutilated, in any of the modes pointed out by the statute for revocation, or is not found at all, it will be presumed the testator destroyed it or mutilated it, *animo revocandi*."

There have been but few cases of revocation of wills reported in our State. In these, there appears to have been no distinction made between the case of an absolute disappearance of a will, and the case of a mutilation or cancellation.

*In re* the will of Claxton, 2 *Brad. R.*, *p.* 334, it was held that: "If a will proved to have been executed, and to have been in the possession of the decedent, cannot be traced to the custody of another, or cannot be found, the presumption of law is, that it has been destroyed, *animo revocandi*."

*In re* the will of Florence, 2 *Brad. R.*, *p.* 281, it was held that: "When the will is last traced to the possession of the testator, and on his decease it cannot be found, the presumption is that it was destroyed by the testator, *animo revocandi*."

In *Idley* v. *Brown*, 11 *Wendell R.*, *p.* 227, Mr. Justice Sutherland said: "A will proven to have had existence, but not found at the death of the testator, is presumed to have been destroyed by him, *animo revocandi ;* and it is incumbent upon a party who seeks to establish such a will, to repel that presumption, and show that it was improperly destroyed." (And see *Betts* v. *Jackson*, 6 *Wend. R.*, *p.* 173.)

There can be no doubt that the cancellation, obliteration and destruction of the signature of a will, must be considered as a revocation of the entire instrument. The statute requires of a will: "It shall be subscribed by the testator, at the end of the will." (3 *R. S.*, *5th ed.*, *p.* 144, § 35.)

The statutes of several of our States are similar in lan-

guage to that of our State, and upon these constructions have been placed, to which I am enabled, by the industry of the counsel for the half-blood next of kin, to refer.

The statute of the State of New Jersey is as follows:

" No devise or bequest in writing, &c., or any clause thereof, shall be revocable, otherwise than by some other will or codicil in writing, or other writing, declaring the same, or by burning, canceling, tearing or obliterating the same by the testator himself or in his presence, and by his direction and consent; but all devises and bequests, &c., shall remain and continue in force until the same be burnt, canceled, torn or obliterated by the testator or by his directions in manner aforesaid, or unless the same be revoked or altered by some other will or codicil in writing, or other writing of the devisor, signed in the presence of three or more subscribing witnesses, declaring such revocation or alteration." (*Nix. Digest*, 913, § 2.)

In the case of *Smock* v. *Smock*, 3 *Stock. R.*, *p.* 156, the will was found in decedent's desk, after his death, with seal and signature cut out. The Chancellor said:

" The will was in the custody of the testator during his life, and upon his death it was found among his depositories, canceled, with his name and seal cut off. Under such circumstances, the testator himself is presumed to have done the act, and the law further presumes that he did it *animo revocandi*. (1 *Williams on Exrs.*, 78.) \* \* \* The complainant produces the will. But upon its face it is a mutilated, canceled will. It is not suggested that it was canceled by mistake or accident." \* \* \* " It is not suggested that it was canceled under circumstances which would render the act inoperative and ineffectual under the express provisions of the statute, as if done by some other person than the testator, but not in his presence, although by his direction and consent. The will is presented under circumstances from which the presumption arises that it was canceled in a manner which the statute

declares effectual—by tearing or obliterating the same by the testator himself." * * *. "This presumption arises from the fact that the will was in the possession of the testator during his lifetime, and at his death was found among his papers mutilated in a way showing a design to cancel it." * * * " The complainant must overcome the presumption which exists against the validity of the instrument. As the case stands, he has no alternative but to take the ground, that this will was mutilated criminally by some person other than the testator."

The statute of the State of Pennsylvania is as follows:

"No will in writing, &c., shall be repealed, nor shall any devise or direction therein be altered; otherwise than by some other will or codicil in writing, or other writing declaring the same, executed and proved, &c., or by burning, canceling or obliterating, or destroying the same by the testator himself, or by some one in his presence and by his express direction." (*Purdon's Dig.*, *p.* 1017, § 16.)

In the case, under this statute, of *The Baptist Church* v. *Robbarts*, 2 *Barr. R.*, *p.* 110, the will was found, after death, in a locked secretary, in an envelope with the seal broken, and the signature of the testator obliterated by a pen being run through it. The Court said: " A strong black line was drawn over and along the whole name. It is in vain to infer, from the evidence in the case, when or how this was done. The will was found in the private chamber of the deceased, in his dwelling, and locked in his private desk. The name was obliterated, and the will canceled. The legal presumption, arising on the evidence, was, that it was the act of the testator. There was no evidence that it was done by accident or mistake, or to disconnect the act from an intention to revoke. It was a canceled will. (*Dunlap on Wills*, 346.) It is true, the name being obliterated, it is at first blush an equivocal act. But the paper being found in the manner in evidence, and being mutilated, it lay on the plaintiffs, who wished

to establish the will, to give evidence how it was done. Without that evidence, the legal inference is that the testator did it himself. The *onus* was cast on the plaintiff before this obliterated paper could be read to the jury."

Judgment rejecting the will affirmed.

[And see the late case of *Evans,* 58 *Penn. R, p.* 238.]

The statute of the State of North Carolina is as follows: "No will or testament in writing, or any clause thereof, shall be revocable, otherwise than by some other will or codicil in writing, or other writing declaring the same, or by burning, canceling, tearing, or obliterating the same, by the testator himself, or in his presence and by his direction and consent; but all wills or testaments shall remain and continue in force until the same shall be burnt, canceled, torn or obliterated by the testator, or in his presence and by his consent and direction, or unless the same be altered or revoked by another will or paper, &c." (*Rev. Code of N. C., p.* 610, § 22.)

In the case of *Bethell* v. *Moore,* 2 *Dev. & Batt.,* 316, under this statute, the will was found with perpendicular lines drawn between every two letters of the signature and another signature, not obliterated; directly beneath that, and two or three papers purporting to be intended codicils prepared, and the whole laid away together.

Chief Justice Ruffin said: "There appears to be a cancellation, and it becomes necessary to look at the extent of it, at all the conduct of the testator, at what he proposed doing at the time, and what he did afterwards, to satisfy the mind whether that was, in fact, meant as a canceling, and was to operate as a revocation immediately and absolutely, or only conditionally upon the contemplation of something else then in view. For, although every act of canceling imports, *prima facie,* that it was done *animo revocandi,* yet it is but a presumption which may be repelled by accompanying or subsequent circumstances." (*p.* 318.) "Supposing that we are to look upon the signature, though not effaced, as canceled by the lattice lines

through it, the inquiry remains, whether that was done with the intent to revoke the instrument, and, if so, to do it immediately and absolutely. It may be admitted that the legal presumption is in the affirmative. Still there is enough to go to the jury as evidence that the revocation was not self-subsisting, but was with the further view of making a new will, with alterations, that the testator immediately changed that purpose, and preferred that his will should stand and the alterations be introduced by way of codicil."

The Vermont case to which I am referred on the points, is one of a lost will. (*Minkler* v. *Minkler*, 14 *Verm. R.*, *p.* 125.)

Such are the American cases. The English cases are much more numerous. Here, as in our own States, it is necessary to quote the exact text of the statutes, that the effect of the constructions given by the Courts, may be fully understood.

The English statute of 29 *Charles II, chap.* 3, § 6, is : "No devise of lands, &c., nor any clause thereof, shall be revocable, otherwise than by some other will or codicil in writing, declaring the same ; or by burning, canceling, tearing or obliterating the same, by the testator himself, or in his presence and by his directions and consent."

And the statute of 1 *Victoria*, is : "No will or codicil, or any part thereof, shall be revoked, otherwise than (by will or other writing) or by burning, tearing or otherwise destroying the same by the testator, or by some person in his presence and by his direction, with the intention of revoking the same."

In the case of *Moore* v. *De Laterre*, 1 *Phil.*, 375, the will was found in a small box, in which decedent's papers were kept. Part of it was cut off. Sir John Nicholl said : "The Court must examine the appearance of the instrument itself ; the three sheets were connected by tape, sealed by her own seal, the same seal annexed to the will itself. The fact is, that some one has carefully cut

out, apparently with scissors, the whole of the instrument or margin, so as to detach it from its frame; the attestation clause also is cut through. It is the duty of the Court to put a rational construction on this act. In my judgment it must have been done for the purpose of canceling, revoking and destroying the validity of this instrument. I can put no other rational construction on the act; it must have been done, not equivocally, but decidedly, for the purpose of revoking the instrument." * *

"The instrument being presumptively revoked, the next question is, *by whom?* Here there can be no difficulty; it was found in her own possession; and it is not suggested that any other person had access to it."

The Court then goes on to say that this presumption must be repelled by *showing* some other purpose intended in mutilating the will, *or* that it was done by another person, adding: "It is not enough to suggest." Probate denied.

In *Rickarts* v. *Mumford*, 2 *Phill.*, *p.* 23, Sir John Nicholl said: "Where the testator has the will in his own custody, and that will cannot be found after his death, the presumption is that he has destroyed it himself, It cannot be presumed that the destruction has taken place by any other person, without his knowledge or authority, for that would be presuming a crime."

In *Wilson* v. *Wilson*, 3 *Phill.*, 543, Sir John Nicholl said: "The last we hear of it (the will), is that the deceased, immediately upon its execution, put it in his pocket and took it away with him. It must have been destroyed, it is presumed, by the deceased himself. * * * We have no fact from which the time of such destruction is necessarily to be inferred."

Similar views are enunciated in *Colvin* v. *Fraser*, 2 *Hagg.*, *p.* 166 ; *Freeman* v. *Gibbons*, 2 *Hagg.*, *p.* 325 ; *Boughty* v. *Moreton*, 3 *Hagg.*, *p.* 191 ; *Lambdell* v. *Lambdell*, 3 *Hagg.*, *p.* 568 ; *Hare* v. *Nesmith*, 3 *Hagg.*, *p.* 192 ; *in re Lewis*, 1 *S. W. and Tr.*, *p.* 31 ; *Wynn* v. *Hevering-*

*ham,* 1 *Coll., p.* 638; *Davis* v. *Davis,* 2 *Addoms' Ec. R., p.* 226; *Moggridge* v. *Thackwell,* 7 *Ves. Jr., p.* 79; *Price* v. *Powell,* 3 *Hurlstone and N., p.* 341.

There is an absolute uniformity in these cases. They all hold to the doctrine of legal presumption where the will is found mutilated in the possession of the decedent, or has disappeared after being last traced to his possession. It is nowhere held that the contestant, the party opposing probate, must account for the mutilation or disappearance of the instrument, or must show such injury to have been the act of the decedent.

In the case at bar, the will was executed by the decedent in the office of her lawyer, and we are left in absolute ignorance of what became of it from that moment until after her death. The witnesses to the will think that it was given by the decedent to her lawyer, Mr. Bagley, but their impressions do not amount to a recollection. It was last seen in her hands by the witness Smith. After the decedent's death, and before her burial, it was found. The envelope was found torn open, and the signature and the name of the principal legatee found canceled. No person has been shown to have been in the room where it was found, except the decedent, the legatee and her uncle, who is her witness. Under these circumstances, I must hold that the evidence which has been adduced by the proponent herself, raises the presumption of cancellation and revocation by the decedent.